**In re Ruel Jackson WINGO and Marie Pruitt Wingo, Debtors.**

**SIGNET BANK/VIRGINIA, Plaintiff,**

v.

**Ruel Jackson WINGO and Marie Pruitt Wingo, Defendants.**

**Civ. A. No. 89–0172–R.**
**Adv. No. 7–88–0032.**

United States District Court,
W.D. Virginia,
Roanoke Division.

July 12, 1989.

John P. Fishwick, Jr., Fishwick & Young, Roanoke, Va., for plaintiff.

T. Daniel Frith, III, Mundy, Rogers & Frith, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

This matter is before me on appeal from the Bankruptcy Court, which overruled Signet Bank's objection to the Wingos' discharge. Signet Bank contends that pursuant to 11 U.S.C. § 523(a)(2)(B), the Wingos' debt to the bank is not dischargeable because the Wingos obtained $63,500 of unsecured loans by using false financial statements. In a Memorandum Opinion and Order dated December 21, 1988, the Bankruptcy Court dismissed Signet Bank's complaint, concluding that the bank had failed to satisfy its burden under 11 U.S.C. §§ 523(a)(2)(B)(iii) and 523(a)(2)(B)(iv) of showing the Wingos intended to deceive the bank with their false financial statements, or that Signet Bank had reasonably relied upon the Wingos' false financial statements. I disagree with the Bankruptcy Court's decision, and accordingly remand this case for proceedings consistent with this Opinion.

### Facts

The relevant facts of this dispute are adequately set forth in the Bankruptcy Judge's Memorandum Opinion entered on December 21, 1988. Briefly, however, on December 31, 1987, the debtors, Ruel Jackson Wingo and Marie Pruitt Wingo, filed a voluntary petition under Chapter 7 of the Bankruptcy Code. The Wingos' bankruptcy petition listed unsecured debt totaling $247,243, including unsecured debt of $63,500 owed to the adversary plaintiff, Signet Bank.

On March 3, 1988, Signet Bank instituted an adversary proceeding against the Wingos claiming that they intentionally had submitted false financial statements, on which the bank reasonably had relied before extending credit. Pursuant to 11 U.S.C. § 523(a)(2)(B), therefore, Signet sought an adjudication that the Wingos' debt was nondischargeable. Specifically, Signet claimed that the Wingos' had obtained unsecured credit of $63,500 between September 1987 and November 1987 based on two allegedly false financial statements.

The Wingos filed the first of the two financial statements at issue on July 29, 1986. In that first financial statement, the Wingos listed outstanding unsecured debt of $10,250. In their second financial statement, filed on July 15, 1987, the Wingos listed outstanding unsecured debt of $13,500 and due credits to banks of $2,800. In both financial statements when asked if they had any contingent liabilities, the Wingos answered, "No". In addition, a paragraph at the bottom of each financial statement, which the Wingos apparently read and acknowledged, stated as follows:

> Each undersigned represents and warrants that *the information provided is true and complete* and that you may consider this statement as continuing to be true and correct until a written notice of the change is given to you by the undersigned....

Despite their representations that they had no contingent liabilities, as well as representations that the submitted financial statements were true and complete, the Wingos had accumulated, according to their bankruptcy petition, unsecured debt of $247,243, at least a part of which clearly represented contingent liability. The Wingos, however, while presently admitting that they recognize their 1986 and 1987 financial statements were inaccurate, defend their omissions by testifying that the unsecured debt listed on their bankruptcy

petition is largely corporate debt incurred by two now-defunct corporations, Planned Profits and Wingo Realty, both of which the Wingos owned and operated. The Wingos explain that many years ago an unidentified banker told them to exclude corporate debt from a personal financial statement. In addition, the Wingos explain that much of their unsecured "corporate" debt is personal liability incurred to satisfy corporate obligations.

The Bankruptcy Court apparently accepted the Wingos' explanation, and in a Memorandum Opinion entered on December 21, 1988, the court denied Signet Bank's objection to the Wingos' discharge. Specifically, Chief Bankruptcy Judge Pearson first concluded that Signet Bank did not reasonably rely upon the debtors' false financial statements before extending credit. Rather, Judge Pearson found that Signet Bank relied primarily on the Wingos' professional reputation in the community and the bank's prior credit relationship with the Wingos. Second, Judge Pearson concluded that the Wingos did not engage in the requisite "positive fraud" necessary to sustain a finding that they intended to deceive the bank. On December 29, 1988, Signet Bank filed its Notice of Appeal. The parties have fully briefed the issues, and this matter is ripe for disposition.

### Discussion

Signet Bank has objected to the discharge of the Wingos' debts under 11 U.S.C. § 523, which provides, in pertinent part, as follows:

§ 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* . \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

. . .

11 U.S.C. § 523.

The Wingos concede that the two written financial statements they submitted to Signet Bank to obtain the unsecured debt at issue falsely represented, in a material way, their financial condition. The Wingos dispute, however, that Signet has satisfied its burden of establishing that the bank reasonably relied upon the false financial statements that the Wingos allegedly submitted with an intent to deceive.

 It is undisputed in this case that for Signet to satisfy its burden of establishing an intent to deceive under § 523(a)(2)(B)(iv), the bank must prove that the Wingos committed actual fraud, i.e., that they intended to defraud the bank by a false financial statement. Constructive or implied fraud is insufficient to bar the discharge of the Wingos' debt to the bank. *See In re Black*, 787 F.2d 503, 505–506 (10th Cir.1986). *Accord In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986).

 The Wingos maintain that they did not intend to deceive the bank because they were operating under the mistaken impression that they did not need to include "corporate" debt on their personal financial statement. While it is true that Signet must establish that the Wingos committed actual fraud, it is equally true that the Wingos' unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts. 3 L. King, *Collier on Bankruptcy* § 523.09 (15th ed. 1989); *see In the Matter of Moran*, 456 F.2d 1030, 1031 (3d Cir.1972), *cert. denied*, 409 U.S. 872, 93 S.Ct. 201, 34 L.Ed.2d 123, *reh'g denied*, 409 U.S. 1050, 93 S.Ct. 534, 34 L.Ed.2d 504 (1972).

I am aware that the Bankruptcy Court made the factual determination that the Wingos did not intend to deceive the bank.

I am further aware that pursuant to Bankruptcy Rule 8013, I should not set aside a Bankruptcy Judge's finding of fact unless it is clearly erroneous. In the case at bar, however, I have little difficulty in concluding that based on the natural inferences from facts admitted by the Wingos, the Bankruptcy Court's finding that the Wingos did not intend to deceive the bank is clearly erroneous.

Initially, the timing of the Wingos' financial transactions between July 1987 and December 1987 is strong evidence of the Wingos' intent. In July 1987, the Wingos submitted a financial statement indicating unsecured debt of $13,500. Based on this July 1987 financial statement, the Wingos then obtained three unsecured notes, totaling $63,500, between September 1987 and November 1987. On December 31, 1987, little more than one month after obtaining their final loan of $28,500, the Wingos filed their voluntary petition under Chapter 7 of the Bankruptcy Code. Clearly, as of their last loan in November, and possibly as early as their first loan in September, the Wingos were well aware that they were in severe financial difficulty. Yet in no way did the Wingos reveal their severe financial difficulties to Signet Bank. According to the paragraph at the bottom of each financial statement, which the Wingos acknowledged, not only did the Wingos have an obligation to submit accurate information on their financial statement, they further had a duty to update any change in their financial condition so that their financial statement remained accurate. It strains reason to accept that the Wingos, evidently successful business-persons in a finance-dominated profession, can seriously maintain that they were not under a duty to inform the bank, to whom they were deeply indebted, of their precarious and deteriorating financial position.

In addition to the suspicious timing of the Wingos various financial transactions, other admitted facts also indicate an intent to deceive by the Wingos. Specifically, Mr. Wingo testified that he incurred personal obligations, such as, *inter alia*, a Dominion Gold Line, to pay off the corporate debts of Wingo Realty and Planned Profits. Mr.

Wingo, though denying that these personal obligations taken out to satisfy corporate debt constituted contingent debt, nevertheless admitted that if the corporations failed to pay the obligations, that it would be the Wingos' personal responsibility to pay any debt. Moreover, despite Mr. Wingo's apparent claims of ignorance, according to his testimony, he was well aware of the personal nature of his obligations because on his tax returns he took as personal interest deductions the interest incurred on personal debt acquired to pay off corporate debt.

In short, the clear import from the admitted facts indicates that the Wingos were aware not only of their deteriorating financial condition, but also of the contingent nature of their obligations, neither of which the Wingos revealed in any way to Signet Bank. Thus, I find that the Wingos intended to deceive the bank in violation of 11 U.S.C. § 523(a)(2)(B)(iv).

■ More troublesome, though, is the Bankruptcy Court's factual determination that Signet did not reasonably rely upon the Wingos' financial statement. Were I reviewing the record *de novo*, I would have little difficulty in concluding that Signet Bank did reasonably rely upon the debtors' financial statements before extending credit. Not only is there direct testimony that the bank relied upon the financial statements, but the narrative supplements and loan review reports indicate that Signet Bank reviewed and scrutinized the debtors' financial condition. To the contrary, however, it simply is unclear to what extent the bank would have altered its relationship with the Wingos had the bank been aware of their financial condition. It is equally unclear to what extent the bank's reliance on the debtors' financial statements were reasonable given the bank's alleged knowledge of the Wingos' financial condition.

Because of Bankruptcy Rule 8013, I must find Chief Judge Pearson's determination that Signet Bank did not reasonably rely upon the debtor's financial statement clearly erroneous. This I cannot do. Similar to Judge Hoffman's decision to remand an analogous situation in *Sovran Bank v.*

*Allen,* 65 B.R. 752 (E.D.Va.1986), I am troubled enough by the reliance issue that I will remand this portion of the appeal for further proceedings. On remand, the Bankruptcy Court may wish to consider evidence of the custom and practice of Signet Bank, as well as the custom and practice of other related banking institutions. Moreover, should the parties desire to adduce additional evidence, further evidence may be taken and further findings made on Signet Bank's reliance on the Wingos' financial statement, and the reasonableness of that reliance.

In sum, the Bankruptcy Court's determination that by submitting a false financial statement the Wingos did not intend to deceive Signet Bank is reversed. The Bankruptcy Court's determination that Signet Bank did not reasonably rely upon the debtors' financial statement is reversed and remanded for further proceedings consistent with this opinion.

The Clerk is directed to send a certified copy of this Memorandum Opinion to all counsel of record and to Chief Bankruptcy Judge H. Clyde Pearson.