In re Ruel Jackson WINGO and Marie Pruitt Wingo, Debtors.

DOMINION BANK, Plaintiff,

v.

Ruel Jackson WINGO and Marie Pruitt Wingo, Defendants.

Civ. A. 89–0703–R.
Adv. No. 7–89–0049.

United States District Court,
W.D. Virginia,
Roanoke Division.

March 12, 1990.

Howard J. Beck, Jr., Gentry, Locke, Rakes & Moore, Roanoke, Va., for plaintiff.

T. Daniel Frith, III, Mundy, Rogers & Frith, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

This case is before me a second time, once on Dominion Bank's ("Bank") appeal from the bankruptcy court and now on the Bank's motion for rehearing (sic) [Motion to Reconsider] on the issue of nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(B). On October 16, 1989, this Court filed an Order and Memorandum Opinion in which I held that the bankruptcy court's finding—that the Bank . had not proved that it reasonably relied on a written financial statement filed by the Wingos ("debtors")—was not clearly erroneous.

The basis for the Bank's Motion to Reconsider is that this case is indistinguishable from this Court's holding in Signet Bank v. Wingo, 113 B.R. 249 (W.D.Va. 1989). In Signet, I reverse the bankruptcy court's finding on the issue of intent to deceive and reversed and remanded on the issue of reasonable reliance. On remand I instructed the bankruptcy court to consider evidence of custom and practice of Signet Bank as well as custom and practice of other banks in the geographical area.

Although similar, the case at bar is factually distinguishable from the Signet Bank case. The resembling facts throughout both cases are that the Wingos are real estate agents with a major real estate company in Roanoke, Virginia. Their work caused them to have several professionally-oriented relationships with local banks, including Signet Bank and Dominion Bank, for a number of years. On December 31, 1987, the Wingos filed a voluntary petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. The debtors' bankruptcy petition listed unsecured debts totaling $247,245 which included loans from both banks.

The following facts, however, distinguish this case from Signet. In the case at bar, the record reveals that Mr. Wingo took numerous prospective buyers to the Dominion branch office located next door to his real estate office. Over an eight-year period, Mr. Wingo took 25 to 30 clients to Dominion Bank for mortgage loans. No such relationship existed in the Signet case. The Wingos also had a "spotless" credit record with the Bank. Over an eighteen-year period, the debtors maintained a Dominion Visa account in which they never missed a payment. Again, no such relationship existed in the Signet case. Additionally, Dominion Bank sent the debtors an unsolicited invitation to attend a presentation by its private banking department in March 1986. The Wingos attended the presentation which is where the Dominion Goldline account was initially discussed. Again, Dominion Bank took the initiative to acquire Wingos' business by writing the Wingos a follow-up letter inviting them to apply for a Goldline line of credit. In Signet, there was no similar affirmative step taken by the bank to extend credit to the Wingos.

The evidence of a long-standing practice of the Wingos referring clients to Dominion Bank to obtain mortgages amply supports the conclusion that an excellent business relationship existed between the Wingos and the Bank. Moreover, the fact that the Bank initiated the contact which led to the loan gives additional support to the conclusion that a very good banking relationship existed between the debtors and the Bank.

Whether this excellent relationship was a reason the Bank gave the loan, however, is not the issue. The question which needs to be answered is to what extent, if any, did

the Bank rely upon the Wingos' financial statement? Therefore, while I adhere to my conclusion that there are facts which distinguish this case from the *Signet* case, I am not convinced, upon further consideration, that the bankruptcy court applied the proper *legal* standard in making its conclusion.

### Statement of Facts

The debtors are licensed real estate agents in Roanoke and have been involved in the business since the mid–1970s. The debtors operated two real estate companies prior to September 1987; Planned Profits, Inc., and Wingo Realty, Inc. Both companies were dissolved prior to the facts giving rise to this suit; however, both companies incurred substantial debt for which the debtors were liable and which they did not list on their application for a Goldline line of credit.

As mentioned before, the debtors have had numerous professional dealings with Roanoke banks because of their real estate background. With respect to Dominion Bank, Mr. Wingo testified that he took 25 to 30 clients to Dominion Bank's branch office located next door to his real estate office to procure home financing. Mr. Wingo also testified that the Bank solicited agents of Boone and Company, with whom he was associated, to attend a private banking presentation. At the presentation, the Goldline account was discussed. Subsequently, Morris Turner, the branch manager prior to Mr. Skeen, sent Mr. Wingo a letter and an application for a Goldline account on March 5, 1986.

In October 1986, the Wingos filed a typed and signed Goldline application with Mr. William Skeen. The Wingos sought Goldline funds because it carried a lower rate of interest than they were currently paying on other debts. The Wingos' application failed to list a $75,000 note and deed of trust in favor of Salem Bank and Trust and additional indebtedness of $36,000 to the Miller family. Mr. Skeen began processing the application by getting a credit report and by preparing a processing worksheet. Mr. Skeen testified that some of the debt on the credit report was reflected on the application and some was not (Tr. 21–22). Because of the inconsistencies, Mr. Skeen had a face-to-face meeting with the Wingos several weeks after he spotted the inconsistencies. After the face-to-face meeting, Mr. Skeen recommended approval of the loan.

Mr. Skeen testified that the bank had eight standard criteria [1] which the applicant should satisfy before a loan is approved, but that he primarily focused on two of the criteria; debt to income ratio and net worth. Mr. Skeen also testified that the Wingos' seventeen-year favorable credit history—never missing a payment on their Dominion Visa account—was significant as was their professional reputation because both indicate credit-worthiness.

On December 31, 1987, the debtors filed a joint Chapter 7 bankruptcy petition over a year after the Goldline account was approved. Much of the unsecured debt listed by the Wingos was business debt incurred by Planned Profits, Inc., and Wingo Realty, Inc., which had been personally guaranteed by the debtors. The debtors' explanation for not listing personally guaranteed business debt on their application is that years ago a banker told them not to include corporate debts on their personal financial statements. Additionally, the debtors point out that no bank with whom they had personally dealt ever directed them to include such debts on their personal financial statements.

### Discussion

A debt is nondischargeable under 11 U.S.C. § 523(a)(2)(B) if the creditor can prove all four elements set out by the

---

1. 1. $30,000 minimum household income.
2. Debt to income ratio of no greater than 36%.
3. Spotless credit history.
4. No prior bankruptcy.
5. Stable employment for at least five years.
6. Employment and income verification.
7. Closing unsecured lines of credit with other banks.
8. Net worth must be ten times amount of Goldline credit limit.

statute. Section 523, in pertinent part, reads as follows:

§ 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services or an extension, renewal or refinancing of credit to the extent obtained by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtors' or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive ...

11 U.S.C. § 523.

The Wingos concede that the financial statement they submitted to Dominion Bank to obtain the unsecured debt at issue falsely represented, in a material way, their financial condition; therefore, elements (i) and (ii) have been met. The sole issue before this Court is whether the bankruptcy court applied the proper legal standard when he found that the Bank did not reasonably rely on the Wingos' written application [i.e., element (iii)].

Section 523(a)(2) is based on § 17(a)(2) of the Bankruptcy Act of 1938; however, Congress added that reliance by the creditor must be reasonable. *See* Pub.L. 95–598, 92 Stat. 2590. Congress added the word "reasonable" so as to codify case law interpreting § 17(a)(2). *See In re Allen*, 65 B.R. 752, 756 (E.D.Va.1986) (citations omitted).

A leading case interpreting § 17(a)(2) is the Seventh Circuit case *Matter of Garman*, 643 F.2d 1252 (7th Cir.1980). *Garman* was decided after the Bankruptcy Reform Act of 1978 was passed but before it took effect. The court said:

[Prior] cases simply stand for the proposition that reasonableness is circumstantial evidence of actual reliance; that is

dischargeability shall not be denied where a creditor's claimed "reliance" on a "financial statement" would be *so* unreasonable as not to be actual reliance at all.

*Id.* at 1256 (emphasis in original).

*Garman* is factually similar to this case. It involved loans made by Northern Trust Bank in Chicago to Ben Garman. Garman submitted three financial statements which were partially relied upon by the Bank. Garman failed to list approximately $50,000 in "claims" that he later listed in his petition for bankruptcy. The bankruptcy judge held that the Bank had failed to prove that it had reasonably relied upon the statements. The district court affirmed. The circuit court reversed holding that the bankruptcy court and district court expressed their opinions "on whether the decision to loan Garman the money was reasonable" rather than addressing whether the Bank's "reliance on the statements was reasonable." *Id.* at 1257. The *Garman* court went on to say that the Bank did not use the "financial statement simply as a 'perfunctory device to be used to contest discharge, ...'", *id. citing* 1A Colliers on Bankruptcy, § 17.16 at 1636 n. 17 (14th ed. 1979), nor did the Bank "bury its commercial head in the sand." *Garman* at 1257.

Subsequent case history to *Garman, In re Allen*, 65 B.R. 752 (E.D.Va.1986); *In re Howard*, 73 B.R. 694 (Bankr.N.D.Ind.1987); *In re Furimsky*, 40 B.R. 350 (Bankr.D. Ariz.1984), has noted that the cases decided prior to the Bankruptcy Reform Act of 1978 and incorporated therein and referred to in *Garman* established several types of situations in which a creditor's reliance would be classified as unreasonable: (1) where the creditor knows from past experience that the financial statement is not accurate, is incomplete, or inconsistent, or the statement is erroneous on its face. *See e.g., Swint v. Robins Federal Credit Union*, 415 F.2d 179 (5th Cir.1969); *In re Mutschler*, 45 B.R. 482 (Bankr.D.N.D. 1984); (2) where the statement contains obviously inadequate financial information (i.e., the application itself does not leave

enough space to provide full financial information or it fails to solicit adequate information.) *See, e.g., In re Adams,* 368 F.Supp. 80 (D.S.D.1973); *In re Andrews,* 33 B.R. 970 (Bankr.D.Mass.1983); (3) where the creditor's investigation of the statement suggests its falsity or incompleteness. *See, e.g., Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971); and (4) where the creditor does not take the usual and customary steps and procedures typical in its own lending practice or in the lending industry in verifying the information provided by the debtor. *In re Allen,* 65 B.R. 752 (E.D.Va.1986).

■ There is no bright line test for reasonableness; therefore, there can be other factual situations which would render reliance unreasonable. *See In re Howard,* 73 B.R. 694, 705–06 (Bankr.N.D.Ind.1987). What must be kept in mind is Congress' intent in adding the "reasonableness" requirement to § 523(a)(2)(B). It seems to me that what Congress intended by incorporating the reasonable reliance requirement into § 523 was to prevent creditors from using a misrepresentation in a financial statement to prevent the debtors discharge when, in fact, the financial statement played no meaningful part in the decision of the creditor to extend credit. In other words, Congress was making it more difficult for creditors to use § 523 in order to argue that a claim is not dischargeable.

The problem which arises is that, although Congress imposed a requirement of "reasonableness," it provided no further statutory guide as to what degree of reliance is necessary to satisfy the "reasonableness" requirement. In *Matter of Garman,* 643 F.2d 1252 (7th Cir.1980), the circuit court, while not interpreting the current law, suggested that "reasonable reliance" is a mere subset of actual reliance ("reasonableness is circumstantial evidence of actual reliance.") *Id.* at 1256 The *Garman* court has been criticized for setting an exceptionally low level of reliance to prevent dischargeability. *See In re Furimsky,* 40 B.R. 350, 354 (Bankr.D.Ariz. 1984). "Actual reliance and reasonable reliance are distinguishable phenomena, and we cannot pretend otherwise." *Id.* at 355.

■ As I view the issue, there are two separate tests which the creditor must meet to satisfy § 523(a)(2)(B)(iii). First, the creditor must prove reasonable reliance which I view as being an objective standard. (Is the financial statement one upon which an ordinary bank in the trade would rely.) Secondly, the creditor must prove that he did, in fact, rely on the financial statement. This, I view as a subjective standard. To meet the subjective standard, the burden of persuasion lies with the creditor to prove that the financial statement was a substantial factor in its decision to extend the loan. By "substantial" I do not mean that "but for" the written document the creditor would not have made the loan. Clearly, banks must be able to look to other factors when granting a loan. A "substantial factor" must be one that weighed in the balance with other factors in making the credit decision. The weight it bears will vary from case to case and, therefore, cannot be quantified.

*Application*

In the case at bar, the bankruptcy court opinion can be read in a way such that it is requiring the creditor to *primarily* rely on the written financial statement in order for reliance to be deemed reasonable. "[I]t is clear that the Bank relied more heavily on Debtors' status as successful, prosperous real estate agents than it did on their financial statement in granting them a Goldline line of credit." (Bankr.Op. p. 9) (footnote omitted). No court has ever held that a creditor must primarily rely on the financial statement in order for reliance to be reasonable.

Dominion Bank apparently attempted to verify the information in the financial statement. Mr. Skeen testified that he called the Wingos and had a face-to-face meeting with them in order to clarify some inconsistencies. Two issues arise for remand due to the Bank's attempt to verify the Wingos' financial statement. (1) Was the Bank's subsequent action after finding some inconsistencies typical of the indus-

try's business practice or typical of Dominion's normal business practice; if not, then reliance is objectively unreasonable. (2) Did the inconsistencies in and of themselves suggest that the financial statement was false or incomplete; if so, reliance thereon is objectively unreasonable and hence, the debt is dischargeable. However, if the inconsistencies were clarified at the face-to-face meeting and the Bank reviewed the Wingos' submitted financial statement in light of the face-to-face meeting, then the Bank's reliance on the statement is not necessarily objectively unreasonable. If the bankruptcy court determines that the bank was not objectively unreasonable in relying on the financial statement, it must determine whether the bank actually relied upon the financial statement. While no bright line test can be established for what constitutes sufficient actual reliance, it is clear that merely glancing at an objectively reasonable financial statement does not suffice to meet the subjective actual reliance test.

In accordance with this opinion, this case is hereby remanded for further consideration by the bankruptcy court.