In re Terry Garrett MOORE and Rosemary Lee Moore, Debtors.

**FOUNDERS BANK OF ARIZONA, Plaintiff,**

v.

**Terry Garrett MOORE and Rosemary Lee Moore, Defendants.**

**Bankruptcy No. 388–33443 RCM–11. Adv. No. 389–3818.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

July 5, 1990.

Daniel B. Jones, Dallas, Tex., for plaintiff.

David S. Stubblefield, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

Following are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052, with respect to the trial on June 28, 1990.

This is an 11 U.S.C. § 523(a)(2)(B) complaint to determine dischargeability of debt filed by Founders Bank of Arizona ("Plaintiff") concerning its claim. Plaintiff contends that its claim, in the amount of $169,476.06 is non-dischargeable pursuant to 11 U.S.C. § 523 by virtue of a materially false financial statement which was allegedly provided to them by Terry Garrett Moore and Rosemary Lee Moore ("Defendants"). During all pertinent times, Defendants were residents of Dallas, Texas. Defendants have denied that they submitted a materially false financial statement to Plaintiff.

### Background Facts

Subsequent to March 1, 1987, Defendant Terry G. Moore ("TGM"), through agents, submitted a statement of his financial condition to Plaintiff.

The financial statement dated March 1, 1987, was submitted on behalf of TGM in connection with a $150,000 loan to be made to TCMA/Crow Associates, Inc. ("Crow"), an Arizona corporation.

TGM was a 55% shareholder and chairman of the board of Crow at all material times.

On or about May 18, 1987, Crow, acting by and through its president, Vernal L. Crow, and its chairman of the board, TGM, executed a promissory note payable to the order of the Plaintiff in the principal sum of $150,000.

Defendants executed a May 14, 1987 guaranty agreement styled "continuing guaranty", by virtue of which Defendants personally guaranteed payment of the promissory note signed on May 18, 1987.

The note signed on May 18, 1987, matured on August 17, 1987.

On or about August 17, 1987, Crow, again acting by and through Vernal L. Crow, its president, and TGM, its chairman of the board, executed a renewal note in the principal sum of $150,000 (the "Renewal Note").

On or about August 17, 1987, Defendants executed another guaranty styled "continuing guaranty", by virtue of which they personally guaranteed payment of the August 17, 1987 Renewal Note.

There was a limited dispute concerning whether there was any communication between TGM and Plaintiff prior to execution of the May 1987 note and guaranty. Defendants denied the existence of any such communication and no one from the bank with direct knowledge testified concerning such communication. Plaintiff's Ex. 8 was inconclusive on any such communication. The Court does find that the March 1, 1987 financial statement of TGM was furnished to the Plaintiff by TGM's agent and with the authority of TGM. There was no testimony concerning the existence of any communication between Plaintiff and Defendants at or about the time of execution of the August 1987 Renewal Note, and the August 1987 guaranty. Plaintiff never questioned the Defendants about any of the entries on TGM's financial statement at the time of the transactions in question.

### Reasonable Reliance and Intent

In order to establish reasonable reliance upon a financial statement for dischargeability purposes, Plaintiff must prove not only that reliance was objectively reasonable, but that subjectively it did rely

on the financial statement. The Court, in *In re Wingo*, 112 B.R. 141 (D.W.D.Va.1990) stated:

> ... To meet the subjective standard, the burden of persuasion lies with the creditor to prove that the financial statement was a substantial factor in its decision to extend the loan. By 'substantial' I do not mean that 'but for' the written document the creditor would not have made the loan. Clearly, banks must be able to look to other factors when granting a loan. A 'substantial factor' must be one that weighed in the balance with other factors in making the credit decision. The weight it bears will vary from case to case and, therefore, cannot be quantified.

### Application

In the case at bar, the bankruptcy court opinion can be read in a way such that it is requiring the creditor to *primarily* rely on the written financial statement in order for reliance to be deemed reasonable. '[I]t is clear that the Bank relied more heavily on Debtors' status as successful, prosperous real estate agents than it did on their financial statement in granting them a Goldline line of credit.' (Bankr.Op. p. 9) (footnote omitted). No court has ever held that a creditor must primarily rely on the financial statement in order for reliance to be reasonable.

Dominion Bank apparently attempted to verify the information in the financial statement. Mr. Skeen testified that he called the Wingos and had a face-to-face meeting with them in order to clarify some inconsistencies. Two issues arise for remand due to the Bank's attempt to verify the Wingos' financial statement. (1) Was the Bank's subsequent action after finding some inconsistencies typical of the industry's business practice or typical of Dominion's normal business practice; if not, then reliance is objectively unreasonable. (2) *Did the inconsistencies in and of themselves suggest that the financial statement was* false or *incomplete;* if so, reliance thereon is objectively unreasonable and hence, the debt is dischargeable. However, if the inconsistencies were clarified at the face-to-face meeting and the Bank reviewed the Wingos' submitted financial statement in light of the face-to-face meeting, then the Bank's reliance on the statement is not necessarily objectively unreasonable. *If the bankruptcy court determines that the bank was not objectively unreasonable in relying on the financial statement, it must determine whether the bank actually relied upon the financial statement. While no bright line test can be established for what constitutes sufficient actual reliance, it is clear that merely glancing at an objectively reasonable financial statement does not suffice to meet the subjective actual reliance test.*

*In re Wingo, supra,* at 145–146. [Emphasis added]

■ The Defendants' financial statement dated March 1, 1987 raised a number of red flags to the Plaintiff. *In re Lippert,* 84 B.R. 612, 617 (Bankr.D.Minn.1988) (Bank failed to obtain information relating to Lippert's "cash in bank" or liabilities); *In re Picou,* 81 B.R. 152, 154 (Bankr.S.D.Fla.1988) (The court discusses bank's failure to check depositories and four situations where reliance may be found to be unreasonable); *In re Howard,* 73 B.R. 694, 705 (Bankr.N.D.Ind.1987); *In re Gallagher,* 72 B.R. 830, 837 (Bankr.N.D.Ind.1987); and *In re Iverson,* 66 B.R. 219, 225 (Bankr.D.Utah 1986). Examples of red flags included the following:

a) The March 1, 1987 financial statement showed cash in banks $486,000; however, Plaintiff never sought to verify where the cash was located or the amount of cash on hand on dates of actual execution of the original or renewal note, either by finding out where the cash was allegedly located at either time, and how much had been used in the interim. The credible evidence did not show the cash figure to be inaccurate on March 1, 1987. The cash was depleted significantly by August 17, 1987. Failure to check cash representations was contrary to objec-

tive, prudent, and normal banking practices as testified to.

b) It is undisputed that on March 1, 1987, Defendant TGM had $786,333 in certificates of deposit ("CDs") which he specifically listed on the financial statement; however, under addendum 2, TGM listed them as "secured". The Plaintiff's witness admitted that "secured" was an ambiguous term. Defendant TGM testified that he meant that they were pledged by the phrase "secured". This was credible. Plaintiff made no investigation of the CDs. Plaintiff's witness testified that, in retrospect, if he had realized the CDs were pledged, he would have been uncomfortable about making this loan in view of the sizeable obligations shown on the financial statement. The sizeable obligations also indicated a necessity for the Plaintiff, at pertinent times, to check the depletion of the cash from the March 1, 1987 financial statement forward.

c) On his various joint ventures and general partnership interests, Defendant TGM listed his percentage of ownership therein as dollar amounts, and his liabilities as, for example, "(45% Liability)" ... "$376,650.00" (Item 14, p. 5, Exs. 5 and 6). In effect, therefore, Defendant only showed his percentage of what he construed to be the liability, but without taking into account his joint and several liability. If his joint and several liability were added, his liabilities would have increased $11,929,988, thereby wiping out his alleged net worth of $12,169,942.33. This fractional liability was itemized this way on ten items in his financial statement. The Plaintiff's witness testified that such witness had been involved in approval of 100 to 150 loans to partnerships, and that limited liability was only seen in two or three thereof (his estimates). In spite of this unusual liability listing, there was no evidence that the Plaintiff ever questioned either Defendant about it in any manner. Defendant TGM did not make a particularly good witness in his own behalf and appeared to be "stonewalling" in certain areas of interrogation; however, the Court finds that Defendant TGM did not list these particular liabilities in this manner through any effort to deceive the Plaintiff, but basically through an amateurish misunderstanding of the concept of joint and several liabilities, and a misunderstanding of the correct way to list those type liabilities. His reference to "secured", with reference to the CDs is likewise found not to be part of any intent to deceive the Plaintiff, but an amateurish approach to preparing a financial statement. If the Court were to find that TGM caused the financial statement to be made with reckless indifference to the accuracy of the information contained therein, then the totality of the circumstances could be sufficient to infer an intent to deceive on TGM's part. *In re Picou, supra,* at 154. However, in this case, the evidence was not sufficient to show that TGM caused the financial statement to be made with reckless indifference to its accuracy.

The Plaintiff did not reasonably rely on the financial statement.

There was insufficient proof that the financial statement was caused to be made or published with intent to deceive by Defendants.

### The Renewal Note

■ Defendants' financial condition deteriorated during the period after execution of the original note and prior to execution of the Renewal Note. Plaintiff argues that, based on common law fraud (by omission), or the following wording in the notes, TGM or Defendants had the duty to update the financial statement of March 1, 1987, before execution of the Renewal Note:

FINANCIAL STATEMENTS: I agree to provide to you, *upon request*, any financial statements or information you may deem necessary. I warrant that all financial statements and information I provide to you are or will be accurate, correct, and complete.

[Emphasis added]. With the exceptions previously noted, the financial statement of

March 1, 1987 appeared otherwise substantially accurate (with caveats for a debtor's assessments of values of his own projects and investments). Except as heretofore discussed, the only other asset value that was extensively discussed in the testimony was Defendant TGM's valuation of his ranch. TGM's explanation of how he arrived at a value for the ranch for the financial statement was not unreasonable.

There was no proof that Plaintiff ever requested any update or that Defendants made any oral or other written representations with respect to the original or Renewal Note. The quoted language from the note does not appear to require an update of financial information except where requested by the Plaintiff. The Plaintiff did not request an update. Therefore, Defendants did not violate such note terms.

This was a § 523(a)(2)(B) complaint. Therefore, § 523(a)(2)(A), possible common law fraud by omission, does not otherwise appear applicable because § 523(a)(2)(A) specifically excludes this type contention by the wording, "... other than a statement respecting a debtor's or insider's financial condition".[1]

### Conclusion

This debt is dischargeable. The Plaintiff did not meet its burden of proof under § 523(a)(2)(B). The March 1, 1987 financial statement was materially false. It related to TGM's financial condition. The Plaintiff did not reasonably rely thereon. There was insufficient proof by the Plaintiff that the Defendants caused same to be made or published with intent to deceive. Judgment will be entered in accordance with the foregoing opinion.

---

1. In 3 Collier on Bankruptcy ¶ 523.08, p. 523–40, 41, it is stated:

   Section 523(a)(2)(A), relating to false pretenses or representations or actual fraud excludes 'a statement respecting the debtor's or an insider's financial condition.' False financial statements are dealt with separately in section 523(a)(2)(B) and the exclusion from paragraph (A) makes clear that the false financial statement exception falls within a category separate from the false representation or actual fraud exception and is subject to special conditions to be met before the exception becomes effective. Paragraphs (A) and (B) of section 523(a)(2) are mutually exclusive.

   [Citations omitted].