In re Charles John MYERS, III, Joan Elaine Myers dba: Scenic Crest Farms, Debtors.

**JOHN DEERE COMPANY, Plaintiff,**

v.

**Charles John MYERS, III, Defendant.**

Bankruptcy No. 2–89–03419.

Adv. No. 2–89–0334.

United States Bankruptcy Court, S.D. Ohio, E.D.

Feb. 19, 1991.

Charles W. Ewing, Hilliard, Ohio, for debtors.

Joseph C. Winner, Casey, McFadden and Winner, Columbus, Ohio, for John Deere Co.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court on a complaint to determine the dischargeability of a debt owed by the defendant, Charles John Myers, III, to the plaintiff, John Deere Company. The matter was tried to the Court on January 24, 1991.

The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I). The following opinion and order shall constitute the Court's findings of fact and conclusions of law.

### I. *Findings of Fact*

The defendant, Charles John Myers, III ("Debtor"), and his wife own and operate a dairy farm in Zanesville, Ohio. On June 19, 1989, they voluntarily filed a joint petition for relief under Chapter 11 of the Bankruptcy Code. Subsequently, on September 26, 1989, the John Deere Company ("Deere") commenced the instant adversary proceeding to determine the dis-

chargeability of a debt owed to it pursuant to 11 U.S.C. § 523(a)(2)(B).

Deere manufactures, sells and finances the purchase of agricultural products. A purchaser wishing to finance the purchase of Deere goods must sign a completed retail installment contract, typically prepared by a dealer of Deere's equipment. The dealer then forwards the contract to Deere's credit services' department in Iowa for the acceptance or rejection of financing. Deere's agreement to finance a purchase is evidenced by the signature of an authorized representative on the contract in a pre-marked space. If the application for financing is incomplete, Deere returns the contract to the dealer who, in turn, obtains a completed application from the purchaser. If Deere rejects the loan request, the installment contract is returned unsigned to the selling dealer. The customer, of course, may obtain financing for the purchase elsewhere.

In the spring of 1989, the Debtor determined that his six- or seven-year-old forage harvester was in need of repair or replacement. After obtaining repair estimates ranging from $30,000 to $40,000, the Debtor agreed to buy a new Deere forage harvester from Suburban Tractor Company ("Suburban") for the sum of $106,200 on the condition that Deere finance the purchase. On May 12, 1989, the Debtor signed an installment contract (the "Contract"), requesting that Deere finance the sum of $93,230 for the purchase of a new forage harvester and swivel tongue. Suburban delivered the harvester to the Debtor that month, prior to Deere's review or approval of the Debtor's request for financing.

Suburban forwarded the Contract to Deere's credit services' department, where it was received on May 31, 1989. Testimony was provided by Bryan Henry, the supervisor of this department, concerning Deere's normal business practices in reviewing requests for financing. According to Henry, his department's review typically includes an assessment of the purchaser's ability to make the payments called for under the contract and the purchaser's net worth as reflected by the total assets and liabilities set forth in his financial statement. Members of his department also confirm that a potential customer has listed legitimate references, although there is no evidence that Deere actually contacts references. If Deere does not have a current financial statement from the purchaser, it is his department's practice to request one.

Deere's credit services department reviews 400 to 600 installment contracts each month. Although Henry has no specific recollection of reviewing the Contract in May or June of 1989, Deere's records reflect that the Contract was returned to Suburban along with a blank financial statement form because the application was not accompanied by a current financial statement from the Debtor. Henry believes that his office advised Suburban that the Contract could not be approved without a current financial statement from the Debtor. Dealers, apparently, do not have the authority to approve a purchaser's request for financing from Deere.

It appears that Suburban delivered the blank financial form to the Debtor. The Debtor thereupon completed the statement in his own handwriting and signed it on June 10, 1989. Suburban forwarded the Contract and completed financial statement to Deere, which received both documents on June 19, 1989. The Contract was accepted by Deere on June 20, 1989. There is no written evidence of Deere's review of the Contract, nor does Henry remember evaluating it; however, it was and is Deere's standard practice to review all installment contracts prior to approval. Henry is confident that he reviewed the Contract in June 1989, otherwise it would not have been approved.

On July 5, 1989, the Debtor and his wife filed the schedules of assets and liabilities required by the bankruptcy rules. Although the schedules were filed July 5, they reflect the Debtor's assets and liabilities as of June 19, 1989, the date on which the petition was filed. The schedules evidence liabilities of $2,195,074.94 and assets of $814,700, or a *negative* net worth of approximately $1.4 million as of the petition date.

The financial statement submitted to Deere, signed just nine days before the petition date, reflected that the Debtor had a *positive* net worth of $1,028,000 as of June 10, 1989. It discloses assets of $2,685,000 and liabilities of $1,657,000. Thus, if the schedules and financial statement were accurate, the Debtor's net worth would have declined approximately $2.4 million in a nine-day span. The Debtor acknowledges that no such decline occurred.

The differences between the itemized values set forth by the Debtor in the financial statement and bankruptcy schedules are extreme. By way of illustration, the following asset figures are contained in the financial statement and schedules:

|  | Financial Statement | Schedules |
|---|---|---|
| Stocks & Bonds | $1,000,000 | $ –0– |
| Livestock | 465,000 | 360,000 |
| Machinery & Equipment | 210,000 | 180,000 |
| Cars & Trucks | 25,000 | 600 |
| Real Estate | 950,000 | 270,000 |

Similar disparities exist in the description of liabilities. The total debt listed in the schedules approximates $2.2 million while the debt in the financial statement aggregates $1.657 million.

■ The Debtor admitted in testimony that the representations set forth in the financial statement were not "the true picture" as of June 10, 1989. Transcript at 76. The Debtor later attributed the discrepancies to (i) an intervening appraisal by the Farmers Home Administration ("FHA") of some of the listed assets, claiming that the appraisal disclosed that certain assets were worth less than the Debtor had opined in the financial statement; and (ii) the use of market values in the financial statement and liquidation values in the schedules. The Court finds that Debtor's explanations regarding these differences, particularly with respect to stocks and bonds, real property, machinery and equipment, and total liabilities are lacking in credibility. The Debtor admittedly knew on June 10, 1989, that he was in serious financial difficulty. In fact, he had consulted with his attorney about the possible filing of a bankruptcy case during the period he prepared and signed the financial statement. The Debtor had to have known on June 10 that he did not have a net worth in excess of $1,000,000, and that, in fact, he was insolvent.

### II. *Conclusions of Law*

■ Section 523(a)(2)(B) of the Bankruptcy Code provides for an exception to discharge of an obligation which is:

(2) for money ... or an extension ... of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money ... or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The Sixth Circuit Court of Appeals has held that a plaintiff in an action based upon § 523(a)(2)(B) must prove its case by clear and convincing evidence. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir.1985). However, the Sixth Circuit's holding was reversed recently by *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), in which the Supreme Court held that the lesser preponderance-of-the-evidence standard applies in dischargeability actions under § 523(a).

The function of a standard of proof is to " 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual

conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970)). The standard serves to allocate the risk of error between the litigants. *See Addington v. Texas*, 441 U.S. at 423, 99 S.Ct. at 1808; *United States v. Kansas Gas & Elec. Co.*, 215 F.Supp. 532, 543 (D.Kan.1963). The preponderance of the evidence standard is the lesser of the three recognized standards or levels of proof.[1] A "preponderance of the evidence" exists when such evidence has, upon consideration and comparison with that opposing it, more convincing force and produces in the mind of the trier of fact a belief that such evidence is more likely true than not true. Thus, the plaintiff must meet its burden of proof in this action by a preponderance of the evidence.

### A.

Section 523(a)(2)(B) excepts from discharge an obligation which is for money or an extension of credit obtained by use of a statement in writing. The parties do not dispute that the financial statement is a written statement; as such, the first prong of § 523(a)(2)(B) has been met.

■ Although the Debtor's testimony acknowledged that the financial statement was inaccurate when completed, his attorney argues that the statement was neither inaccurate nor materially false at the time it was signed. The Debtor's counsel asserts that the financial statement represents the Debtor's reasonably held opinion as to his financial condition on June 10, 1989. As the argument goes, FHA's decision to foreclose on its secured interests in the Debtor's property, and its succeeding appraisal, disclosed lower values than those set forth by the Debtor in the financial statement submitted to Deere.

There is no support in the record for counsel's argument. First and foremost, the Debtor freely admits that the financial statement did not present the true picture as of its execution date. However, it cannot be said that he has admitted that the statement was materially false. The evidence nevertheless establishes that the asset values set forth in the financial statement were both inaccurate and false. The Debtor's 250,000 shares of stock in Myers Scenic Crest Dairy, Inc., a fledgling, unsuccessful restaurant venture in Zanesville, Ohio, were valued in the financial statement at $1 million. However, this stock clearly had no value on June 10, 1989, and the Debtor knew that. The Debtor properly valued the stock at "zero" in his bankruptcy schedules as of June 19, 1989, representing its true value then and on June 10. The Debtor's claim that he believed the stock had a market value of four or five dollars per share on June 10 is preposterous. The Debtor knew on June 10 that the stock had no market value whatsoever.

The Debtor's real property was not worth $950,000 on June 10, 1989, as represented in the financial statement. This value is based on no known fact or opinion, and there is no evidence that the Debtor ever believed this to be the market or liquidation value of the real property in question. There likewise was no basis for valuing the livestock at $465,000 on June 10. Similarly, the Debtor's machinery and equipment, and his cars and trucks, were not worth the amounts set forth in the financial statement. The Debtor knew, when he completed the financial statement, that these asset figures were false and would lead Deere to believe that his financial condition was much healthier than it actually was.

The same is true of the liabilities listed on the financial statement, which are understated by approximately $500,000. Although the Debtor included his expected

---

**1.** In a criminal case the interests of the defendant are of such magnitude that historically they have been protected by the "beyond a reasonable doubt" standard, which is designed to exclude as nearly as possible the likelihood of an erroneous judgment. The "clear and convincing" standard of proof typically is used in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing. *See Addington v. Texas*, 441 U.S. at 423–24, 99 S.Ct. at 1808.

debt to Deere as a liability, he intentionally understated other liabilities without attempting to explain his basis for doing so and without alerting Deere. The Debtor's understatement of his liabilities was done intentionally.

It is clear, and the Court specifically finds, that the Debtor's representations in his financial statement of June 10, 1989, were inaccurate. It is equally clear that the Debtor intended to present untrue financial information to Deere in connection with Deere's evaluation of his request for financing. Thus, the statement is false and was so intended.

The Court further finds the falsity to be material. The requirement of materiality means a "substantial or important untruth." *Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 8 B.C.D. 708, 711 (Bankr.N.D.N.Y.1981). The representations set forth in the financial statement meet this standard by any level of proof, especially considering the swing of $2.4 million in the Debtor's net worth.

### B.

■ Deere also must prove that the Debtor intended to deceive it through the submission of a materially false financial statement. In specific, Deere must show that the alleged false statement was either knowingly false or made so recklessly as to warrant a finding that the Debtor acted fraudulently. *Knoxville Teachers Credit Union v. Parkey (In re Parkey)*, 790 F.2d 490 (6th Cir.1986); *Third Nat'l Bank v. Schatten*, 81 F.2d 538 (6th Cir.1936). Deere has met this standard.

■ Few debtors will admit openly of deceitful intent. Thus, such intent may be inferred from circumstantial evidence and implausible testimony. *First Nat'l Bank of Redbud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424 (7th Cir.1985). An intent to deceive may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor. *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754

(9th Cir.1985); *City Loan Bank v. Nechovski (In re Nechovski)*, Adv. No. 2–85–0214 (Bankr.S.D.Ohio Sept. 1, 1987).

■ Although the Debtor does not appear to be a dishonest man, the evidence clearly discloses his deceitful intent with respect to the purchase of the subject harvester. The Debtor knew on June 10, 1989, that the financial statement he completed in connection with his loan request was materially false. The Debtor realized, for example, that he owed $500,000 more to his creditors than listed. He was aware that his land was worth a fraction of $950,000 and that the stock in the family restaurant was valueless. The Debtor knew that various other assets mentioned above were worth considerably less than the amounts listed in the financial statement. The Debtor also knew, this Court concludes, that if he had accurately valued his assets and liabilities the request for financing would have been denied.

The Debtor's claim that he believed the financing request had been approved already—that the financial statement was a mere formality—rings hollow. If the Debtor truly believed this, then there would be no reason to falsify the financial statement—he simply could have disclosed an accurate negative net worth of more than $1.4 million without fear of the loan request being denied. It is far more plausible, given the Debtor's dire need for a new forage harvester, that he falsified his financial statement so as to mislead Deere. Knowing that his worsening financial condition would preclude financing elsewhere, the Debtor presented this untrue picture to Deere because, without doing so, he could not obtain financing to purchase the equipment in question.

The Debtor likely knew at the time he completed the financial statement that he might have to seek the protection of this Court. The Debtor also knew that Deere's approval of the loan was required. Faced with these financial pressures, the probable inability to obtain a loan elsewhere, and the critical review of his financial condition by Deere representatives in Iowa, the Debtor

prepared a materially false statement with the intent of deceiving Deere.

## C.

■ The final prong of § 523(a)(2)(B) requires Deere to demonstrate that it reasonably relied on the Debtor's false financial statement. This provision of § 523 requires the Court to undertake a two-part analysis: (1) did the creditor actually rely on the financial statement; and (2) was the reliance reasonable?

### 1. *Actual Reliance*

■ Direct proof of actual reliance is difficult to obtain. As a result, courts customarily have found that actual reliance may be proven by circumstantial evidence. *First Nat'l Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372 (7th Cir.1983); *Northern Trust Co. v. Garman (Matter of Garman)*, 625 F.2d 755 (7th Cir.1980). A creditor need only establish its reliance in fact; a showing of unreasonable reliance may negate a finding of reliance in fact. *Matter of Garman*, 625 F.2d at 761. Finally, partial reliance on a false representation in connection with an extension of credit is sufficient to prevent the discharge of the underlying debt. *Lincoln First Bank v. Tomei (In re Tomei)*, 24 B.R. 204, 206 (D.C.N.Y.1982); *Bazemore v. Stehling*, 396 F.2d 701, 703 (5th Cir.1968). " 'It is sufficient if [the false statement] was a substantial factor in causing the [extension of credit].' " *In re Tomei*, 24 B.R. at 206 (quoting *In re Clancy*, 279 F.Supp. 820, 822 (D.Colo.1986), *aff'd*, 408 F.2d 899 (10th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969)).

■ Here, Deere satisfied its burden of proving actual reliance. The evidence establishes that the Contract was returned unaccepted to Suburban because it was not accompanied by a current financial statement. Clearly, Deere would not have requested a recent financial statement upon initial receipt of the Contract if it did not place some reliance upon the information contained therein. This increased vigilance on behalf of Deere is important circumstantial evidence of actual reliance. *See In re Kreps*, 700 F.2d at 376.

Additionally, Henry's testimony that Deere's normal business practice is, and was then, to review financial statements prior to accepting any request for financing is credible. There is no evidence to suggest that Deere did not follow its regular business practice with respect to the financial statement at issue. Although Deere relied partially on the Debtor's good payment history with it on prior installment contracts,[2] the Contract also was approved in reliance on false information contained in the financial statement and would have been rejected if the true financial picture of the Debtor had been disclosed. Such circumstantial evidence is sufficient to demonstrate actual reliance. *See In re Kreps*, 700 F.2d at 375.

### 2. *Reasonable Reliance*

■ The Court next must examine whether Deere's reliance on the financial statement was reasonable. As one court has observed, "[t]here is no bright line test for reasonableness; therefore, there can be no other factual situations which would render reliance unreasonable." *Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141, 145 (W.D.Va.1990). That Court also stated:

> What must be kept in mind is Congress' intent in adding the "reasonableness" requirement to § 523(a)(2)(B). It seems to me that what Congress intended by incorporating the reasonable reliance requirement into § 523 was to prevent creditors from using a misrepresentation in a financial statement to prevent the debtors discharge when, in fact, the financial statement played no meaningful part in the decision of the creditor to extend credit. In other words, Congress was making it more difficult for credi-

---

**2.** In 1987 and 1988, the Debtor purchased various items of John Deere-manufactured farm equipment from Suburban. Deere financed those purchases pursuant to its standard installment contracts. Prior to the filing of his bankruptcy case, the Debtor had satisfied his obligations under those contracts in a timely manner.

tors to use § 523 in order to argue that a claim is not dischargeable.

*See also Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1166 (6th Cir.1985) "[T]he reasonableness of reliance isn't rigorous, but is to get at creditors acting in bad faith." *Id.* It may be shown by establishing that the lender would not have extended credit had accurate information been provided. *Kunzler v. Bundy (In re Bundy),* 95 B.R. 1004, 1009 (Bankr.W.D. Mo.1989).

Deere reviews a host of factors in deciding whether to accept or reject an installment contract, including the customer's net worth and ability to repay the debt on the terms proposed. It is not this Court's duty to second guess Deere's decision to make a loan or to set loan policy for Deere. *See Matter of Garman,* 625 F.2d at 761. "If a lender chooses to let net worth rather than an income be the determinative factor in loan decisions, it is not for the court to say that this is bad business policy requiring discharge of the resulting debt in bankruptcy." *Id.* Based upon this standard, the Court finds that Deere's financial statement contained reasonable criteria upon which to base a lending decision.

Moreover, the Court notes that the creditor does not have an affirmative duty to verify the accuracy of information contained in a financial statement. *Earls v. Southgate Bank and Trust Co. (Matter of Earls),* 80 B.R. 978 (W.D.Mo.1987). Nor must the creditor conduct an independent investigation. *Capital City Bank & Trust v. Kroh (In re Kroh),* 88 B.R. 987 (Bankr. W.D.Mo.1988). It is reasonable for a creditor, such as Deere, to assume that the financial statement is accurate when it is complete and contains no apparent inconsistencies. *Horowitz Finance Corp. v. Hall (In re Hall),* 109 B.R. 149, 154 (Bankr. W.D.Pa.1990). We can expect no higher degree of care in the average business transaction.

Based upon the foregoing, the Debtor's debt to Deere is determined to be nondis-

chargeable. Judgment shall be entered in favor of the plaintiff.

IT IS SO ORDERED.