**In re Randolph S. MARTIN and Catherine Fox Martin, Debtors.**

**Union Planters Bank National Association, Plaintiff/Appellee,**

v.

**Randolph S. Martin, Defendant/Appellant.**

No. 03–3221.

United States District Court, C.D. Illinois, Springfield Division.

March 16, 2004.

---

Gordon Gates, Gates, Wise & Schlosser PC, Springfield, IL, for Plaintiff.

Emmet Fairfield, Brown, Hay & Stephens, Springfield, IL, for Defendant.

### ORDER

SCOTT, District Judge.

Randolph Martin appeals from the Bankruptcy Court's decision that his debt to Union Planters Bank National Association (Bank), evidenced by a promissory note executed on December 17, 2001, was excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) because Martin secured the loan through the use of a false financial statement. For the reasons set forth below, this Court affirms the Bankruptcy Court's decision.

### STATEMENT OF FACTS

Martin is a cardiologist. He is a partner with 160 other physicians in a multi-specialty group practice known as Springfield Clinic, LLP (Springfield Clinic). He is also an airplane pilot. In 1990 or 1991, he and an individual named Don Mallette formed a corporation called Capital Aircraft, Inc. (Corporation). Each owned 49 percent of the stock in the Corporation. Martin's friend and attorney Jeremy Michaels owned the other two percent. The Corporation initially sold airplane parts. Most of their business was in South Africa. Beginning in 1992, the Corporation began selling DC9 aircraft to an airline in South Africa called BOP Air. The Corporation then began brokering commercial aircraft. The Corporation also maintained a large aircraft parts business. Most of the Corporation's sales were outside of the United States.

Beginning in 1998, Martin and Mallette began setting up limited liability companies (LLCs) to own and lease commercial aircraft and aircraft engines. Martin and Mallette set up six separate LLCs. Martin and Mallette formed an additional limited liability company as a holding company called Capital Aircraft Holding Company, LLC, (Holding Company). Martin and Mallette each owned 50 percent of the membership interests in the Holding Company. The Holding Company, in turn, owned membership interests in each of the six other LLCs. Other investors owned the remaining membership interests in the LLCs. Many of these investors were physicians at Springfield Clinic. Each of the LLCs purchased a commercial grade aircraft or aircraft engines. The LLCs leased the aircraft and aircraft engines to various clients around the world, mostly in South America.

Each LLC borrowed money to finance the purchase of its equipment. Each loan was secured by the equipment and by personal guaranties executed by the members of the LLC and by Martin and Mallette as members of the Holding Company. The Enterprises also sometimes paid other physicians at Springfield Clinic to execute additional personal guaranties for the loans. Martin understood that he was personally liable, with the co-guarantors, to pay the loans if the LLCs defaulted. Martin testified at trial that, "I believe I signed guarantys for anything I ever did." *Record on Appeal (d/e 1) Document No. 8, Transcript of Trial Proceedings on June 30, 2003 (Trial Transcript)* at 43.

Mallette ran the day-to-day operations of the Corporation, the Holding Company, and the LLCs (collectively the Enterpris-

es). Mallette was the managing member of each LLC. Mallette testified at trial that he and Martin had "day-to-day interaction" concerning the operations of the Enterprises. *Trial Transcript* at 183. Martin also was a member of the Board of Directors of the Corporation and was its Chief Executive Officer. *Id.* Steven Keith Bentley provided business management consulting services to the Enterprises from August 1998 to January 2001. He testified that Mallette ran the day-to-day operations of the Enterprises. According to Bentley, Martin was involved in policy-setting, "acting as a member of the board of directors." *Supplemental Record on Appeal Transcript of Deposition of Steven Keith Bentley (d/e 6) (Deposition)* at 57.

According to Martin, the aviation sector deteriorated in 1999 or 2000. In early 2000, the LLCs' equipment lessees began falling behind in their rental payments. Martin then started lending money to the Holding Company to cover the debt service on the LLCs' loans. Between January 2000 and June 30, 2000, he advanced over $800,000.00 to the Enterprises. By the summer of 2001, Martin had advanced over $1,000,000.00. By January 2002, Martin had advanced approximately $1,700,000.00 to the Enterprises.

Martin also formed a separate corporation called Martin Leasing, Inc. (Martin Leasing). Martin owned all of the stock of Martin Leasing and was its only officer. Martin Leasing owned a 1980 Cessna Citation II (Citation) aircraft which Martin used for his personal travel. Martin Leasing owed approximately $1,500,000.00 on a loan secured by the Citation. Martin personally guaranteed this loan.

In November 2001, Timothy Young talked to Martin about refinancing the Citation. Young was an independent broker who specialized in arranging aircraft financing loans. Young told Martin that he believed he could find a loan with a lower interest rate. Martin authorized Young to see if he could secure a new loan to refinance the Citation.

Martin provided Young with his 1999 and 2000 tax returns and a personal financial statement dated April 30, 2001 (Financial Statement). *Record on Appeal (d/e 1) Document No. 8, Trial Exhibits Accompanying Trial Transcript (Exhibit)*, Exhibit 20. According to Young, Martin confirmed that the Financial Statement was still currently accurate. *Trial Transcript* at 88. The Financial Statement stated that Martin had assets totaling $6,720,000.00, and liabilities totaling $2,664,000.00, resulting in a net worth of $4,056,000.00. The Financial Statement disclosed that Martin excluded his retirement account at Springfield Clinic worth $350,000.00 from the calculation of his net worth.

The Financial Statement listed the value of Martin's stock in the Corporation at $350,000.00, and the value of his membership in the Holding Company at $250,000.00. These values came from Bentley. Bentley provided Martin with the values for an earlier financial statement dated June 30, 2000. Bentley testified that these values were accurate representations of Martin's interest in the Enterprises, at the time he stopped providing services to the Enterprises, in January 2001. *Deposition* at 20, 32.

The Financial Statement contained certain inaccuracies. The Financial Statement listed the Citation as a personal asset and the loan secured by the Citation as a personal loan, rather than a corporate asset of Martin Leasing and a corporate loan which Martin had personally guaranteed. Martin included a condominium in Florida, valued at $100,000.00, which was actually titled in his mother's name. Martin, however, paid for the condominium. Martin

listed a motorcycle which he no longer owned. Martin did not list the $1,000,000.00 plus in loans that he had made to the Holding Company since January 2000. The Financial Statement overstated the value of his publicly traded securities in various brokerage accounts; however, Martin accompanied the Financial Statement with current account statements from the various brokers which disclosed the current market value of those assets.[1]

The Financial Statement also did not disclose the personal guaranties that Martin signed to guarantee the debts of the Enterprises. At that time, Martin had guaranteed $23,000,000.00 of the Enterprises' debts. These debts were also secured by the aircraft, aircraft engines, other assets of the Enterprises, and by the personal guaranties of the other investors. Martin testified that Bentley developed the format that he used for the Financial Statement. Martin testified that he did not list the guaranties because the format did not include a place for personal guaranties. He said that he never listed the guaranties on any of the financial statements he gave to any lender. *Trial Transcript* at 63. He testified that the guaranties were not listed as liabilities on the Financial Statement because he believed that they were not liabilities because the assets of the Enterprises exceeded the debt. *Id.* at 45. He also testified that he believed the co-guarantors were financially sound. *Id.* at 65.

Bentley developed the format for the Financial Statement while he was providing consulting services to the Enterprises. He helped prepare financial statements for Martin and the other individual investors in the Enterprises. He did not advise Martin or the other guarantors to list the personal guaranties on their financial statements because, during the time that he assisted them, the Enterprises were solvent and the likelihood that the individuals would be required to pay the debts was remote. He stated that he would have advised the guarantors, including Martin, to include the guaranties on their financial statements if the guarantors had better than a 75 percent chance of having to pay the debts. *Deposition* at 28. Bentley stated that the guaranties were also indirectly reflected on the financial statement form that he developed in that the value of Martin's interest in the Corporation and Holding Company was a net value that reflected the value of the Enterprises' assets less liabilities that Martin personally guaranteed. *Deposition* at 23.

Martin's 1999 and 2000 tax returns that Martin gave Young showed that he had an adjusted gross income in 1999 of $978,046.00 and an adjusted gross income in 2000 of $587,054.00. *Exhibit* 2. The difference in income was due in large part to the reduction in Martin's taxable wages from $384,705.00 in 1999 to $9,231.00 in 2000. *Exhibit* 1 at 271, *Exhibit* 2 at 287.[2] The 2000 return showed accumulated passive losses of $1,621,073.00, from the Enterprises. *Exhibit* 2 at 283. The returns

---

1. The Financial Statement valued these accounts at $595,000.00. The actual value was closer to $248,000.00. Martin had accounts at Smith Barney, the Lincoln Fund, and Metropolitan Life Insurance Company (Met Life). The Financial Statement listed the Smith Barney account at $200,000.00, the Lincoln Fund account at $220,000.00, and the Met Life account at $75,000.00. The account statements

from these funds showed that the Lincoln Fund account was worth $159,375.14; the Met Life account was worth $47,711.07; and the Smith Barney account was worth $41,185.37.

2. The exhibit page numbers referenced in this Order are the Bates stamp numbers on each page identified by the phrase "UP/Martin" followed by the page number.

noted that Martin's investment in each of the Enterprises, and his interest in Springfield Clinic, were "at risk." *Exhibit* 2 at 284 & 314.

Young sent faxes to various lenders notifying them of the opportunity to refinance the Citation. The fax included basic information about the Citation and Martin, along with the first two pages of Martin's 2000 tax return. He sent one of these faxes to Michael Holland, a representative of the Bank who handled airplane financing loans. Holland contacted Young and asked for more information. On December 11 or 12, 2001, Young forwarded to Holland the full tax returns and the Financial Statement. Holland forwarded the information to the loan underwriters for the Bank.

Deborah Culler was the underwriter in charge of evaluating the proposed loan to Martin. She and her staff reviewed the Financial Statement and the tax returns received from Young, and secured a credit report. *Trial Transcript* at 140. Holland provided information on the estimated value of a 1980 Citation, such as the one owned by Martin Leasing. Culler stated that the Bank considered the borrower's ability to generate income to pay the debt service as a key factor in evaluating these types of loans. The Bank also considered the value of the collateral and the borrower's credit history and his other assets.

The proposed loan would be 89.6 percent of the estimated $1,757,000.00 value of the plane. Martin's available disposable income, over and above taxes and living expenses, equaled 156 percent of his debt service obligations disclosed on the Financial Statement. *Trial Transcript* at 146. Martin thus had ample income to make regular payments on his debts, including the debt service on the Citation. The credit report revealed a Beacon score of 705. This score is a rating of a person's credit history. Culler testified that anything over 660 is an excellent score.

The only question in Culler's mind was the reduction in Martin's taxable wage income from 1999 to 2000. Culler testified that the Bank contacted Young to find out the reason for the change in income. Young informed a Bank representative that Martin's wage income was reduced in 2000 because he decided to defer his income from his medical practice that year. On December 13, 2001, Culler's staff prepared a Credit Memo recommending that the Bank approve the loan. *Exhibit* 7. The Credit Memo referred to information contained in the Financial Statement, the tax returns, the credit report, and the Beacon score as the basis for the recommendation.

The Bank followed Culler's recommendation. Martin Leasing signed the new promissory note in the principal amount of $1,575,560.00 on December 17, 2001. Martin personally guaranteed this debt. The Bank's representative inspected the plane on December 19, 2001. The Bank's loan committee formerly approved the loan on December 20, 2001. *Exhibit* 8 at 363. The Bank funded the loan on December 24, 2001, and paid off the prior lender. The written report on the inspection of the Citation was dated December 26, 2001. *Exhibit* 18 at 479.

The financial problems of the Enterprises continued. In late 2001 and early 2002, Martin and Mallette attempted to negotiate alternate financing for the Enterprises. Martin hoped the new financing would enable him to recover $1,500,000.00 of the $1,700,000.00 that he had advanced since January 2000. The new financing did not materialize. Eventually, the Enterprises became insolvent. Martin filed personal bankruptcy on May 24, 2002.

Martin's first meeting of creditors was scheduled for June 17, 2002. *See* 11 U.S. § 341. Pursuant to Bankruptcy Rule 4004, the deadline for filing complaints to object to the dischargeability of the debt was 60 days thereafter, or August 16, 2002. The June 17, 2002, date for the first meeting of creditors was continued to August 8, 2002, because the original Bankruptcy Trustee declined to serve. The meeting began on August 8, 2002, but was not completed on that date. The meeting resumed on August 15, 2002, and was completed on that date.

On August 15, 2002, the Bank filed a motion to extend the time to file complaints to object to the dischargeability of its claim. The Bank's motion stated that the meeting of creditors had been continued to August 8, 2002, and that Bank wanted additional time, to "explore the relevant facts and circumstances and determine whether the filing of such actions may be appropriate." *Record on Appeal (d/e 1) Document No. 20, Motion of Union Planters Bank to Extend Time to File Dischargeability Complaints and Objections to Discharge,* at 2.

The Bankruptcy Court entered an order on August 16, 2002, granting the motion. Martin filed an objection to the extension of time. The Bankruptcy Court held a hearing on the objection on September 20, 2002. Martin states in his brief that the hearing on the objection was held by telephone. The record on appeal contains no transcript or other evidence of what occurred during that telephone hearing. The record, however, contains a transcript of an in-court hearing that occurred on that date. Most of this hearing concerned other matters. The participants in the hearing briefly discussed the extension of the time in which to file non-dischargeability complaints. The participants in discussion were Bankruptcy Judge Larry Lessen; the Bankruptcy Judge's law clerk, Mr. Cinotto; Martin's Bankruptcy Trustee, Mr. Dunn; and Martin's counsel, Mr. Gates:

> Mr. Cinotto: Do you want to extend the discharge date for 30 days or so?
>
> Mr. Dunn: Yes, I think that is good.
>
> The Court: I will extend the discharge date 30 days.
>
> Mr. Dunn: The reason he says that is because Union Planters has until Monday to file their discharge.
>
> Mr. Gates: That's today.
>
> Mr. Dunn: It's the 23rd, I think.

*Record on Appeal (d/e 1) Document No. 27, Transcript of September 20, 2002, Hearing,* at 24. The Bank filed its complaint in this action on September 18, 2002.

The case went to trial before the Bankruptcy Court on June 30, 2003. Martin, Young, Holland, Culler and Mallette testified. Bentley's deposition was also admitted into evidence. Culler testified that if she had known that Martin had outstanding personal guarantees in excess of $23,000,000.00, she would never have recommended the loan. She would not have even considered making the loan. She would have considered Martin's guaranties as outstanding liabilities for purposes of evaluating the proposed loan. Martin's liabilities would have far exceeded his assets and he would not have had sufficient income to service the debt. *Trial Transcript* at 152–53. She testified that the Bank would not have made the loan.

Culler further stated that if she had known Martin had been lending significant amounts of money to the Enterprises, she would have inquired further because those loans represented a significant part of Martin's assets. She would have requested financial information from the Enterprises. She would have wanted to know

how the Enterprises were going to pay Martin back.

Martin's counsel cross-examined Culler concerning the significance of Martin's personal guaranties, in her evaluation process. Martin's counsel referred to the guaranties as contingent liabilities:

Q. And let's talk about contingent liabilities. The negative value of a contingent liability is affected by several things, is it not? It is affected by whether or not the principal obligor is solvent, right? In other words, if the principal obligor is paying a debt and he's got tons of dough, the guarantor's problems are not too great. Are you with me on that?

A. In most cases, yeah.

Q. And if the value of the security, the collateral given for the note, exceeds the note, again, the negative value of the guaranty to the guarantor is not a big deal, right?

A. That I differ with you on a little bit more, but I will go with you.

Q. And if there are a fair amount of co-guarantors, all of whom are men of substantial means, that would also affect how you view these guarantys, would it not?

A. It would depend on the type of guaranty.

. . .

Q. In other words if he has some guy over here, if Bill Gates has guaranteed the note along with Randy Martin and are joint and several guarantys, you would be less inclined to be too worried about Randy's guaranty, right?

A. If Bill Gates had guaranteed the loans with Randy Martin, I wouldn't have cared whether Dr. Martin guaranteed.

Q. Thank you. Now you have got in this instance your lawyer keeps talking about $20 million in guarantys. What he hasn't mentioned to you is that all of these guarantys have co-guarantors, all of whom are surgeons or physicians in this town, and there is at least five or six for each particular loan. And he also didn't mention to you that at the time these guarantys were made, the assets of the entities exceeded— the value of the assets exceeded the amount of the debt. Now, if I tell you those things, does that change your blanket statement that if I had known about these things, I would have never made the loan?

A. I am going to add something to the blanket statement. If I had then known that they were being flown into where they were being flown, I would add that, and I would found that out, and I would not have made the loan.

Q. Back to my question, if you don't mind.

A. If I would have gotten—if I was aware of that, I would have gotten the financial statements of Capital Air, Inc., I would have required it for the past three years.

Q. Right. And let's assume those financial statements for the past three years showed that the company was solvent in making its payments and had a positive net worth in excess of a million dollars?

A. If it had showed that it had a positive net worth in excess of a million dollars, that is not much with a $20 million guaranty.

Q. I don't know how much it was. Assume it was a positive net worth of a substantial amount.

A. Well, if it had shown that, then I don't think he would be sitting here today. So it probably wouldn't have shown that.

Q. Again, ma'am, please answer my question. If it had shown that, you wouldn't have cared, would you, about the guarantys?

A. They would not have mattered, no.

*Trial Transcript* at 172–724.

Martin's counsel asked Mallette several questions about the value of the Enterprises. Mallette testified that the fair market value of the Corporation as of March 31, 2001, was $552,609.00, and Martin's interest was worth $276,000.00. He testified that the total fair market value of the Holding Company and LLCs was $3,663,538.00 as of March 31, 2001, and that the value of Martin's interest in them was $612,887.00. *Trial Transcript* at 190–96.[3] To arrive at these figures, Mallette first opined on the fair market value of the aircraft and other equipment owned by the LLCs. He then added any outstanding receivables to arrive at his estimate of the value of the LLCs' assets. He then subtracted outstanding debts to arrive at his opinion of the LLCs' net worth. Mallette ignored depreciation of the assets in making these calculations. He further assumed that the unpaid lease payments and other receivables were completely collectable. Mallette testified that the net worth of the Enterprises would have been the same in November and December 2001. *Id.*

Bentley disagreed with Mallette's estimates. He testified that as of June 30, 2000, Martin's stock in the Corporation was worth $350,000.00, not $276,000.00, and his interest in the Holding Company was worth $250,000.00, not $612,887.00. Bentley further testified that the Corporation and the Holding Company lost value after the September 11, 2001, terrorist attack on the United States. He testified that the terrorist attack drove down the value of aviation businesses 50 to 75 percent. *Deposition* at 41–45. He opined that in November 2001, the value of Martin's interest in the Holding Company would have been a "negative number." *Deposition* at 44. He opined that the value of Martin's interest in the Corporation would have been reduced, although he did not give an estimate of the amount of the reduction in value. *Id.*

### THE OPINION BELOW

The Bankruptcy Court issued its Opinion on August 28, 2003. *Record on Appeal (d/e 1) Document No. 9 Opinion entered August 28, 2003 (Opinion)*. The Bankruptcy Court found that the debt was excepted from Martin's discharge pursuant to 11 U.S.C. § 523(a)(2)(B) because Martin had secured the loan through the use of a false financial statement.

The Bankruptcy Court first found that the Financial Statement was materially

---

**3.** Mallette identified the six LLCs by number. He testified that the LLCs Nos. 1 and 2 each owned an aircraft worth $2.8 million and each owed slightly more than $1.8 million, giving each a net worth of $999,597.00. *Trial Transcript* at 190–91. He testified that LLC No. 3 owned an aircraft worth $2.5 million and had additional receivables. He testified that LLC No. 3 owed $3.42 million, leaving a negative net worth of $688,656.00. *Id.* at 192–93. He testified that LLC No. 4 owned an airplane worth $1.5 million and owed $1.3 million, leaving a net worth of $183,000.00. *Id.* at 193. He testified that LLC No. 5 owned aircraft engines and equipment worth $5.9 million, plus $500,000 in receivables. This LLC owed $4.64 million, leaving a net worth of $1,882,000.00. *Id.* at 194. He testified that LLC No. 6 had a fair market value of $288,000.00. The sum of Mallette's estimates total fair market value of these six LLCs is $3,663,538.00. ($999,597.00 + $999,597.00– $688,656.00 + $183,000.00 + $1,882,000.00 + $288,000.00 =$3,663,538.00).

false. The Bankruptcy Court applied two different methods of analysis to determine whether the statement was materially false. The first method examines whether the statement offers a substantially untruthful picture of the financial condition of the debtor. *Id.* at 8. *See Matter of Bogstad,* 779 F.2d 370, 375 (7th Cir.1985). The second method is a "but for" test which looks at whether the financial institutions would have made the loan had it known the debtor's true financial condition. *Opinion* at 9. *See In re Harasymiw,* 895 F.2d 1170, 1172 (7th Cir.1990). The Bankruptcy Court also stated in its summary of the applicable law that the failure to disclose material information may render a financial statement materially false; that contingent liabilities are material if the debtor is sophisticated and consciously aware of the existence of the liability; and that the sophisticated debtor has a duty to disclose the contingent liabilities. *Id.* at 9–10, *citing In re Wingo,* 113 B.R. 249, 252 (W.D.Va.1989); *In re Guistolisi,* 61 B.R. 821, 823 (Bankr.S.D.Fla.1986).

The Bankruptcy Court found that the financial statement was materially false under either the "but for" analysis or the "untruthful picture" analysis. The Bankruptcy Court found Culler's testimony, that the Bank would not have made the loan had it known about the guaranties, to be credible. The Bankruptcy Court further found that the omission of the guaranties from Martin's financial statement painted a substantially untruthful picture of Martin's financial condition. *Opinion* at 10.

The Bankruptcy Court then determined that the Bank reasonably relied on the materially false statement. The Bankruptcy Court looked at the totality of the circumstances to determine whether the reliance was reasonable. *Id.* at 11–16. The Court listed 11 different factors for determining the reasonableness of the Bank's reliance. *Id.* at 11. The Bankruptcy Court found, in particular, that Martin's level of sophistication was a factor in the reasonableness of the Bank's reliance. The Court noted that Martin was highly educated and was an experienced businessman. Martin had been in the airplane business for thirteen years and had extensive involvement with personal guaranties of business debt. The Bankruptcy Court noted that Martin used an agent, Young, to solicit the business from the Bank. Given the level of Martin's sophistication, the Court concluded that the Bank could reasonably expect him to be able to prepare a personal financial statement that would accurately represent his financial condition. The Bank, therefore, acted reasonably when it relied on the Financial Statement in combination with the tax returns, credit report, and Beacon score to conclude Martin was a good risk for the loan.

Finally, the Bankruptcy Court found that Martin intended to deceive the Bank. The Bankruptcy Court stated that an intent to deceive can be proven either through direct evidence, or circumstantial evidence that logically raises an inference that the debtor knew or should have known that the false representation would induce the lender to make the loan. The Bankruptcy Court stated that intent to deceive can also be established by reckless indifference or reckless disregard of the accuracy of the information in the financial statement. The Bankruptcy Court noted that the material omission of a substantial contingent liability by a sophisticated borrower, which could not have been merely an oversight, was evidence of intent to deceive. *Id.* at 16. *See Matter of Sheridan,* 57 F.3d 627, 633 (7th Cir.1995); *In re Hodges,* 116 B.R. 558, 561 (Bankr. N.D.Ohio 1990). The Bankruptcy Court also cited the case of *In re Jones,* 88 B.R.

899 (Bankr.E.D.Wis.1988), for the proposition that a rebuttable presumption of intent to deceive arises from publishing a materially false financial statement.

In applying these legal principles to the facts in this case, the Court found that Martin had an intent to deceive. The Court stated that Martin admitted that he was aware of the guaranties. The Bankruptcy Court found that this admission meant that Martin did not omit the guaranties from the Financial Statement as an oversight; rather, he made a conscious decision to leave them off. The Bankruptcy Court found this conscious decision to omit this material information was sufficient evidence to establish intent to deceive. *Opinion* at 17.

The Court then concluded that the debt was excepted from discharge pursuant to § 523(a)(2)(B). The Bankruptcy Court reserved for a later hearing the determination of the amount of the non-dischargeable debt.[4]

## *ANALYSIS*

■■■ Martin argues on appeal that the Bankruptcy Court erred in determining that his debt to the Bank was non-dischargeable under § 523(a)(2)(B).[5] Exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir.2000). · To establish that Martin's debt to the Bank was non-

dischargeable under § 523(a)(2)(B), the Bank had to prove by a preponderance the evidence that: (1) Martin made a statement in writing; (2) the statement was materially false; (3) the statement concerned Martin's financial condition; (4) Martin made the statement with the intent to deceive; and (5) the Bank actually and reasonably relied on the statement. *Id.* Martin argues that the Bankruptcy Court erred in its determination that:

1. the Financial Statement was materially false;

2. Martin intended to deceive the bank;

3. the Bank relied on the Financial Statement; and

4. the Bank's reliance was reasonable.

Martin also appeals from the Bankruptcy Court's order granting the Bank's motion to extend the time to file § 523 non-dischargeability complaints.

■■■ This Court reviews the Bankruptcy Court's factual determinations for clear error only. *Bankruptcy Rule* 8013. A factual finding is clearly erroneous if on reviewing the evidence, this Court is, "left with the definite and firm conviction that a mistake has been committed." *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). The Court reviews the Bankruptcy Court's legal conclusions *de novo*. *Matter of Sheridan*, 57 F.3d at 633. Decisions within the discretion of the Bankruptcy Court may only be reviewed for an abuse of discretion. A decision is an abuse of discretion

---

4. The Bankruptcy Court had previously granted Martin's request to bifurcate the proceedings, reserving to a later hearing the determination of the amount of the non-dischargeable debt.

5. Section 523(a)(2)(B) states, in part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor cause to be made or published with the intent to deceive.

only if no reasonable person could agree with the Bankruptcy Court. *See In re Morris,* 223 F.3d at 554. Under these standards of review, the Court finds no basis to reverse the Bankruptcy Court's decision.

### A. *The Material Falsity of the Financial Statement*

■ The Court sees no basis to question the Bankruptcy Court's finding that the Financial Statement was materially false. Culler testified that the Bank would not have made the loan had it known about the guaranties. The Bankruptcy Court found her testimony to be credible. The fact that the financial institution would not have made the loan if the facts been known, is a "recurring guidepost" to show that a financial statement is materially false. *In re Harasymiw,* 895 F.2d at 1172. Based on that guide post, the Bankruptcy Court's conclusions were not clearly erroneous.

In addition, the evidence supports the conclusion that the guaranties represented a significant risk of liability to Martin in November 2001, and their omission rendered the Financial Statement materially false. Starting in January 2000, and continuing for the next two years, Martin lent large amounts of money to the Enterprises because equipment lessees were not paying the LLCs the rent on the equipment leases. By June 30, 2000, he had advanced the Enterprises over $800,000. By the summer of 2001, that figure had increased to over $1,000,000.00. By January 2002, his loans to the Enterprises totaled $1,700,000.00. The Enterprises' constant need for cash advances supports the inference that they were in serious financial difficulty and were at significant risk to default on the loans that Martin had guaranteed.

In addition, Bentley testified that after September 11, 2001, Martin's interest in the Holding Company had a negative value. The Holding Company's only assets were the membership interests in the LLCs, which owed the $23,000,000.00 that Martin had guaranteed. A negative value in the Holding Company means that the membership interests in the LLCs had a negative value, which implies that the assets of the LLCs were no longer sufficient to repay the loans guaranteed by Martin. This evidence supports the finding that by November 2001, Martin was at significant risk of being called upon to perform on his $23,000,00.00 in personal guaranties. Based on this evidence, the Bankruptcy Court did not clearly err in finding that the omission of those guaranties from the Financial Statement gave a materially false picture of Martin's financial condition. *See In re Napier,* 205 B.R. 900, 905–06 (Bankr.N.D.Ill.1997).

Martin argues that Culler admitted that the guaranties were not material. Martin relies on Culler's testimony quoted above. Culler made no such admission. Culler stated that if Bill Gates, one of the richest persons in the world, had personally guaranteed these debts, then she would not have worried about Martin's guaranty. Bill Gates did not guarantee these debts; thus, this observation is meaningless. Culler also agreed that the net worth of the entities primarily obligated to pay the guaranteed debts could affect the significance of a personal guaranty on a guarantor's personal financial statement. If the business entity possessed a substantial positive net worth over and above the guaranteed debt, then the guaranties would not be material in the Bank's loan evaluation process. Culler, however, stated that $1,000,000.00 in net worth would not be significant in this situation, given the $20,000,000.00 in guaranteed debt. Culler did not agree that Martin's guaran-

ties were immaterial given the financial condition of the Enterprises.

Martin argues that Mallette and Bentley's testimony established that the net worth of the Enterprises was so great that Martin's risk of being required to pay on the guaranties was negligible, especially considering the existence of other guarantors. This Court disagrees. Bentley testified that he did not believe that Martin was required to list the guaranties on his June 30, 2000, financial statement because the Enterprises had a positive net worth at that time. Bentley also testified, though, that Martin should have listed the guaranties on the Financial Statement if the financial condition of the Enterprises worsened, and the likelihood increased that he and his co-guarantors would be required to perform on their guaranties.

The evidence indicates that the Enterprises' financial condition worsened by November 2001. Between June 2000 and November 2001, Martin continued to advance hundreds of thousands of dollars to the Enterprises to keep them afloat. Martin's loans increased the Enterprises' debt and lowered their net worth. Then the September 11 terrorist attack drove down values of aviation businesses, including the Enterprises. Bentley testified that by November 2001, Martin's interest in the Holding Company had a negative value, and his holdings in the Corporation had a reduced value. Given this evidence, the Bankruptcy Court did not clearly err in finding that Martin faced a real risk of liability by virtue of the guaranties and so their omission from the Financial Statement rendered the statement materially false.

This Court acknowledges that Mallette disagreed with Bentley, concluding that the Enterprises still had a net worth of approximately $3,600,000.00 in November 2001. This Court, however, cannot re-verse because of a conflict in the evidence. The Bankruptcy Court's factual findings are consistent with competent evidence in the record and so are not clearly erroneous even if other evidence might be conflicting. *See EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 309 (7th Cir.1988) ("[W]here there are two permissible views of the evidence, [bankruptcy court's] choice between them cannot be clearly erroneous." *quoting Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

Martin also argues that the Bankruptcy Court based its decision on an incorrect legal standard. Martin argues that the Bankruptcy Court held that the failure to disclose personal guaranties, *per se,* rendered the Financial Statement materially false. This is incorrect. Part of the Bankruptcy Court's summary of the law arguably appears to require disclosure of personal guaranties as a matter of law. The Bankruptcy Court's finding that the Financial Statement was materially false, however, was not based on a *per se* rule. Rather, the Bankruptcy Court analyzed the evidence presented under both the "but for test" and the "substantial untruthfulness test" and found that the Financial Statement was materially false. *Opinion* at 10. As explained above, this finding is not clearly erroneous.

### B. *Intent to Deceive*

The Bankruptcy Court also did not clearly err in finding that Martin intended to deceive the Bank. Intent may be proven either through direct or circumstantial evidence. *Matter of Sheridan,* 57 F.3d at 633. As Martin sets out in his reply brief, an intent to deceive may be inferred if: "1) the statement is materially false; 2) Martin knew his statement was false or was reckless in making the false statement; and, 3) knew or should have

know [sic] that Union Planters Bank would be induced to make the loan as a result of the materially false statement." *Reply Brief* at 15, *citing Matter of Sheridan*, 57 F.3d at 633. The Bankruptcy Court found that each of these three factors had been proven. The Bankruptcy Court found that: (1) the Financial Statement was materially false because of the omission of the $23,000,000.00 in personal guaranties; (2) Martin, a sophisticated businessman, made a conscious decision to omit the guaranties from the Financial Statement and so knew that the statement was false or was reckless in making the statement; and (3) Martin knew or should or known that any new lender would be induced to make the loan based on the materially false statement. The Bankruptcy Court's finding on each of these points is not clearly erroneous.

As set forth above, the evidence supports the conclusion that the Financial Statement was materially false. Further, the evidence supports the conclusion that Martin consciously decided to omit the existence of the guaranties from the Financial Statement. The Bankruptcy Court found that Martin was a sophisticated businessman. Martin vociferously protests that he is a novice in the ways of business, but the evidence supports the Bankruptcy Court's finding to the contrary. Martin is a partner in a large medical practice with 160 physician partners. A medical practice with 160 partners is a significant business. He also was involved in the Enterprises for over ten years. He was Chief Executive Officer and a member of the Board of Directors of the Corporation. He was in daily contact with Mallette concerning the operations of the Enterprises. He participated in making policy for the Enterprises. He was able to testify cogently about the structure of the Enterprises, which involved a corporation, a holding company, and six other LLCs that held the various aircraft and engines as legally separate ventures. *See Transcript* at 8–14. He formed Martin Leasing to own the Citation, rather than own the plane directly as a personal asset. He also had extensive experience with personal guaranties. He said that he signed a personal guaranty for anything he ever did. He understood that he and his co-guarantors were legally obligated to pay the debt, should the Enterprises default on the loans. All of this evidence supports the Bankruptcy Court's finding that Martin was a sophisticated businessman.

The Bankruptcy Court found that Martin consciously decided to omit any disclosure of $23,000,000.00 in contingent liabilities from his personal financial statement. Martin testified that he knew the guaranties existed and left them off the Financial Statement because he decided that they were not liabilities. *Transcript* at 45. The Bankruptcy Court found that, under these circumstances, a conscious decision by a sophisticated businessman to omit $23,000,000.00 in personal guaranties from this Financial Statement because he deemed them not to be liabilities raised an inference of an intent to deceive. *Opinion* at 16–17. Such a finding is not clearly erroneous. *See In re Hodges*, 116 B.R. at 562; *In re Wingo*, 113 B.R. at 252; *In re Guistolisi*, 61 B.R. at 823.

The evidence also supports the conclusion that Martin knew that the Bank would rely on the materially false statement to make the loan. Martin and Bentley both testified that Martin had previously prepared financial statements for the purpose of applying for bank loans. Young told Martin that he needed a current financial statement as part of a package that he would send to prospective lenders. Martin gave Young the Financial Statement and told Young that this Financial Statement was currently accurate. Martin author-

ized Young as his agent to solicit loans to refinance the Citation through the use of the Financial Statement. This evidence indicates that Martin understood that a lender such as the Bank would rely on the Financial Statement when deciding whether to extend credit.

Martin argues that the Bank did not prove that he knew the Financial Statement was materially false or that he was reckless in making the statement. He argues that the Bank's evidence proved at best that he made an honest mistake in believing that the guaranties were not material. The Court disagrees. The evidence supports an inference that Martin was reckless in omitting the guaranties from the Financial Statement. Martin testified that the aviation sector of the world economy began having problems as early as 1999. He further testified that as early as January 2000, the Enterprises were not generating enough income to pay their bills; he had to lend the Enterprises money to keep them from defaulting on the guaranteed debts. Over the next two years, he advanced $1,700,000.00 to the Enterprises. Martin clearly knew that there was a problem. The September 11 terrorist attacks shocked the aviation industry further, thereby compounding the financial problems of the Enterprises. This evidence supports the inference that Martin recklessly ignored the Enterprises' financial difficulties when he decided that his $23,000,000.00 in personal guaranties of these troubled businesses' debts were not material to a statement of his personal financial condition. At a minimum, such a finding of recklessness is not clearly erroneous.

Martin relies heavily on the Bankruptcy Court's statement that, "It well may be"

that Martin did not believe the guaranties were material. *Opinion* at 17. Martin argues that this statement by the Court indicates that the Court only found Martin to be negligent, not reckless. This Court disagrees. When read in the context of the entire Opinion, the Bankruptcy Court found that Martin was a sophisticated businessman who consciously hid his contingent liabilities. The Bankruptcy Court did not find Martin to be merely negligent.

Martin argues that the Bankruptcy Court used the wrong legal standard when it stated that a rebuttable presumption of an intent to deceive arises upon the publishing of a materially false financial statement. The Bankruptcy Court cited several cases when it summarized the law regarding an intent to deceive under § 523. *Opinion* at 16–17. In that summary, the Bankruptcy Court listed persuasive authority that said that such a presumption arose from publishing a false financial statement. *In re Jones,* 88 B.R. at 903. The Bankruptcy Court, however, did not rely on this authority in its analysis. Rather, the Court found that the evidence raised an inference that Martin intended to deceive the Bank. Since the Bankruptcy Court did not rely on any presumptions, the reference to the statement in the *Jones* case is *dicta* and is not a basis for reversal.[6]

## C. *Reliance*

▋ The finding that the Bank relied on the Financial Statement also is not clearly erroneous. Culler testified she was the underwriter who recommended that the Bank make the loan. She further testified that she relied on the Financial Statement in making this recommendation.

---

**6.** This Court does not address whether the use of such a presumption is legally correct under

§ 523(a)(2)(B).

608

The recommendation in the Credit Memo prepared by Culler and her staff refers to information in the Financial Statement. The Bankruptcy Court found Culler to be credible. This evidence supports the conclusion that the Bank relied on the Financial Statement. The decision is not clearly erroneous.

Martin argues that the loan was made because Holland was friends with Young and that the Bank may not have received the Financial Statement before it made the decision to make the loan. These arguments are inconsistent with Culler's testimony that she relied on the Financial Statement. The Bankruptcy Court found Culler to be credible. This Court will not disturb that credibility determination.

### D. *Reasonable Reliance*

 Martin also challenges the Bankruptcy Court's finding that the reliance was reasonable. Reasonable reliance must be evaluated in context of the totality of the circumstances. Generally, " 'reasonableness is circumstantial evidence of actual reliance' and ... a creditor should not be denied protection against discharge unless the 'creditor's claimed "reliance" on a "financial statement" would be so unreasonable as not to be actual reliance of all.' " *In re Morris,* 223 F.3d at 553, *quoting In re Garman,* 643 F.2d 1252, 1256 (7th Cir. 1980).[7] In considering the issue of reasonable reliance, the Court should not second-guess a financial institution's lending decision. *In re Morris,* 223 F.3d at 553. If under a totality of the circumstances, a false financial statement appears to give a complete picture of a debtor's financial condition, a creditor is entitled to rely on the statement without verification:

[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.... Absent any facts reasonably indicating verification was necessary, we are not persuaded that the ... failure to verify rendered [the creditor's] reliance so unreasonable as to discharge [the debtor's] debt.

*Garman,* 643 F.2d at 1260.

Under this standard, this Court cannot say that the Bankruptcy Court clearly erred in its finding that the Bank's reliance was reasonable. The Financial Statement appears to be a complete statement of Martin's assets and liabilities. Martin accompanied the Financial Statement with account statements from various brokerage houses giving updated information on the marketable securities that he owned. The Financial Statement disclosed Martin's retirement account separately. The Bank reviewed Martin's tax returns for 1999 and 2000. These returns showed ample income to pay the debts disclosed on the Financial Statement, including the debt secured by the Citation. The Bank's underwriters inquired about the discrepancy in Martin's taxable wages in 1999 and 2000, showing that the underwriters reviewed the tax returns. The Bank secured a credit report and a Beacon score. The report and the Beacon score of 705 were consistent with the picture of Martin's financial condition presented in the Financial Statement. The Bank further secured an inspection of the Citation before funding the loan. The Bank thus confirmed the condition of the collateral before extending the credit. Given the steps taken by the Bank, the Bankruptcy Court's find-

---

**7.** The *Garman* opinion interpreted § 17(a)(2) of the pre–1978 Bankruptcy Act. The opinion's interpretation of reasonable reliance, however, still applies to § 523(a)(2)(B) of the current Bankruptcy Code. *In re Morris,* 223 F.3d at 553 n. 2.

ing of reasonable reliance was not clearly erroneous.

■ Martin argues that the Bank failed to follow proper procedures in evaluating the loan application. The underwriters took a day, at most, to recommend approving the loan. Young sent information on December 11 and 12, 2001; Culler decided to recommend approving the loan on December 12; and her staff completed the Credit Memo on December 13. The Bank secured Martin's signature on the loan documents on December 17, 2001, two days before its inspector had even seen the aircraft and confirmed its existence. This Court agrees that the Bank's procedures seem unconventional; however, Culler testified that the Bank regularly tried to act quickly on aircraft loans. *Trial Transcript* at 154–55. The Bankruptcy Court found Culler's testimony to be credible. The Bankruptcy Court and this Court should not second-guess the Bank's lending policies and procedures. *In re Morris,* 223 F.3d at 553. The expedited procedures the Bank used to approve the loan do not make the Bankruptcy Court's finding of reasonable reliance clearly erroneous.

Martin also argues that numerous factors should have raised red flags that would have reasonably required the Bank to inquire further. Martin notes that the Financial Statement and the statements from the brokerage account showed that Martin suffered significant reductions in the value of his marketable securities. He argues that this should have created some question in the mind of the Bank's personnel that would require further verification. The Court disagrees. The Bank was primarily interested in Martin's earning capacity as an indication of his ability to pay the debt service. Secondarily, the Bank was interested in the condition of the Citation since it would be the collateral for the loan. Martin's marketable securities were not as important to the Bank's evaluation of the loan; a reduction in those accounts would not necessarily have been a red flag. The Bankruptcy Court's decision on this point was not clearly erroneous.

Martin also argues that his tax returns raised a red flag because they disclosed that his investments in the Enterprises were "at risk." Martin argues repeatedly that the "at risk" notation on the tax returns told the Bank representatives that Martin was liable for the Enterprises' debts. This is incorrect. The "at risk" notation only told the Bank that Martin could deduct the Enterprises' losses on his personal tax return under certain circumstances. *See* 26 U.S.C. § 465. An investment may be "at risk" for purposes of the Internal Revenue Code under several circumstances. For example, "[A] taxpayer shall be considered at risk for an activity with respect to amounts including—(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, . . . ." 26 U.S.C. § 465(b)(1)(A). In such a circumstance, the "at risk" notation on a tax return only means that the taxpayer had contributed money or property to the business, not that he was personally liable for any of the debt of the business. Thus, the "at risk" notation on Martin's tax return did not necessarily tell the Bank that he was liable for the debts of the Enterprises.

Martin also notes that the returns told the Bank that Martin had $1,621,073.00 in accumulated passive losses in his investment in the Enterprises. Martin's accumulated passive losses told the Bank little or nothing about Martin's ability to repay the proposed loan. Rent is passive income. 26 U.S.C. § 469(c)(2). This would include the rent collected by the LLCs on the equipment leases. Losses from businesses that generate passive income are

passive losses. 26 U.S.C. § 469(d)(1). Martin could deduct his share of the Enterprises' passive losses from his personal income, but only to the extent of his passive income. 26 U.S.C. § 469(a)(1). Losses that exceeded the passive income were accumulated by Martin on his tax return and carried forward to the next taxable year. 26 U.S.C. § 469(b). The accumulated passive losses on Martin's return, thus, reflected a cumulative figure of excess passive losses amassed over time by Martin on his personal tax returns. The figure did not indicate anything about the current financial condition of the Enterprises. The figure further did not indicate that Martin was personally liable for any losses of the Enterprises.

■ Beyond this, Martin's argument implies that a lender must assume that any borrower who owns an "at risk" business investment is liable for all the debts of the business, and the lender cannot rely on a personal financial statement from such a borrower and must investigate the financial well-being of the business. This is inconsistent with the concept of reasonable reliance set forth in *Garman* and cited with approval in *Morris*. A lender is entitled to believe that the prospective debtor is honest and rely on the financial statement that appears to be complete. *In re Garman*, 643 F.2d at 1260. An honest borrower will disclose the extent of contingent liabilities that materially affect his financial condition. A lender is not expected to question notations on a tax return which are not obviously inconsistent with the borrower's financial statement. The Bankruptcy Court did not clearly err in finding that Martin's tax returns did not raise a red flag. The Bankruptcy Court's finding of reasonable reliance was not clearly erroneous.

E. *Extension of Time to File Non–Dischargeability Complaint*

■ The Bankruptcy Court also did not abuse its discretion in allowing the Bank's motion to extend the time to file a complaint challenging the dischargeability of its claim. Whether to grant the extension is a decision within the discretion of the Bankruptcy Court. A reasonable person could have concluded that the circumstances of this case warranted an extension. The Bankruptcy Rules contemplate that a creditor will have sixty days after the first meeting of creditors to file a complaint to object to the dischargeability of a debt. *Bankruptcy Rule* 4004. In this case, the first meeting of creditors did not actually begin until August 8, 2002, only seven days before the deadline for filing a complaint. A reasonable person could conclude that a creditor should be entitled to some additional time under these circumstances.

■ Furthermore, the Bankruptcy Trustee supported the request for an extension at the in-court September 20, 2002, hearing. The Trustee has a fiduciary duty to act in the best interest of creditors. *Matter of Salzer*, 52 F.3d 708, 712 (7th Cir.1995). Given the Trustee's position in favor of granting an extension, and the delay in the meeting of creditors, this Court cannot conclude that the Bankruptcy Court abused its discretion in granting the request.

■ Martin argues that he was denied his right to notice and a hearing. Martin was entitled to notice and a hearing on whether to grant the extension. *Bankruptcy Rule* 4004. The Bankruptcy Court improperly entered the order on August 16, 2002, before giving Martin notice and the opportunity to ask for a hearing. The Bankruptcy Court, however, granted a hearing on September 20, 2002, to consider Martin's objection to the extension. The

hearing occurred promptly, before Martin was required to respond to the Bank's complaint.[8] Martin's counsel was present and had an opportunity to argue against the extension. Martin was not prejudiced by the Bankruptcy Court's procedures.

Martin states in his brief that the Bank presented no evidence during the telephonic hearing, but Martin did not present any evidence to support that assertion. The record on appeal contains no transcript or bystander's report attesting to what occurred during the hearing. Based on the record presented, the Bankruptcy Court did not abuse its discretion by granting the Bank an extension of time to file its complaint.

THEREFORE, the decision of the Bankruptcy Court is AFFIRMED. All pending motions are denied as moot. This case is closed. The Bankruptcy Court may proceed with the determination of the amount of the non-dischargeable debt owed by Randolph S. Martin to Union Planters Bank, National Association.

IT IS THEREFORE SO ORDERED.

---

**8.** Martin's counsel's comments at the hearing September 20, 2002, in court, quoted above, indicate that he did not know on that date that the Bank had filed its complaint two days earlier. Martin, thus, was given the hearing before his counsel had to spend any time reviewing the complaint.